# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 17-871


**STATE OF LOUISIANA**

**VERSUS**

**ALI LEE BARCONEY**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 3816-15
HONORABLE ROBERT L. WYATT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN D. SAUNDERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and
Elizabeth A. Pickett, Judges.


**CONVICTION AFFIRMED;**
**REMANDED WITH INSTRUCTIONS.**

**John F. DeRosier**
**District Attorney**
**Fourteenth Judicial District**
**Carla S. Sigler**
**Charles Robinson**
**Karen C. McLellan**
**Assistant District Attorneys**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P.O.Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Ali Lee Barconey**

**Ali Lee Barconey**
**Main Prison**
**Louisiana State Prison**
**Angola, LA 70712**
**PRO-SE**
     **Ali Lee Barconey**

**SAUNDERS, Judge**

On January 8, 2015, Defendant, Ali Lee Barconey, was charged by bill of indictment with the September 25, 2014 second degree murder of Nathaniel Reynaud, in violation of La.R.S. 14:30.1. Three codefendants, Travis Syntel Barber ("Mr. Barber"), William Lee Carter ("Mr. Carter"), and Bryant Anthony Payne ("Mr. Payne"), were also charged with second degree murder. A fourth codefendant, Ineatta Stevens Arrington ("Ms. Arrington"), was charged with obstruction of justice under La.R.S. 14:130.1(A)(1).

On March 22, 2017, Defendant proceeded to trial. Following three days of testimony, the jury found Defendant guilty as charged in an 11-1 vote. On April 10, 2017, the trial court sentenced Defendant to a mandatory life sentence without benefit of probation, parole, or suspension of sentence.

Defendant now appeals his conviction and sentence, raising two assignments of error, as follows: (1) there was insufficient evidence to support his conviction for second degree murder; and (2) the trial court erred in denying his repeated objections to La.Code Crim.P. art. 782(A).

## FACTS:

Dwayne Willis ("Mr. Willis") testified that he and his wife were present at Howard Olivier's ("Mr. Olivier") house talking with Mr. Olivier and the victim, Nathaniel "Dirty Red" Reynaud ("Mr. Reynaud"), when they saw three people burst into the house with guns. Mr. Willis could not identify the three individuals, as he testified they were wearing ski masks or bandannas over their faces. He testified that during a struggle in the hallway of the house, he was shot on the side of the head. Mr. Willis further testified that all three intruders were shooting guns and that he was shot with a revolver.

Mr. Olivier took the stand next. Mr. Olivier admitted that he had been selling drugs for "[a] long time, some years, some years." He testified that he and Mr. Reynaud were sitting around with Mr. Willis and Mr. Willis's wife when someone kicked in his front door. He and Mr. Reynaud had both been doing cocaine. He was shot twice, and after running into Mr. Willis, he jumped out of the window of his back bedroom. He, like Mr. Willis, was unable to identify the assailants who entered his home.

Mrs. Lekena Pappion ("Mrs. Pappion"), Mr. Willis's wife, testified that she and her husband went to visit her sister-in-law who lives next door to Mr. Olivier when they saw Mr. Olivier and Mr. Reynaud. She testified that as she and her husband were preparing to leave Mr. Olivier's home, the front door flew open, and three men, all wearing black with their faces covered, entered. Mrs. Pappion testified that she escaped out the front door and hid by her car while two of the intruders were in the back of the trailer with her husband and Mr. Olivier. She testified she heard two loud shots shortly after she made it out of the trailer, which sounded to her like they were in the living room where Mr. Reynaud had been previously sitting. She testified that the third gunman did not shoot them and took off. She then checked on Mr. Reynaud, but he was already dead, so she tried to get her husband medical help, as he was bleeding profusely. Like the prior witnesses, Mrs. Pappion could not identify the gunmen, as their faces were covered.

Jennifer Hoffpauir ("Officer Hoffpauir"), an evidence officer with the Lake Charles Police Department, testified that she took photographs of the crime scene. She also identified a black ski mask recovered from the hallway of Mr. Olivier's residence. Officer Hoffpauir also obtained video surveillance from two businesses in the area, Dyer's Tires and Southwest Mobile Home. The footage from Dyer's Tires showed what appeared to be Defendant's Chevy Trailblazer entering Allen

2

Street, the dead-end street on which this shooting took place, a few minutes before the 9-1-1 call reporting the incident was received. The vehicle left Allen Street moments before the call was received. Officer Hoffpauir acknowledged that although the vehicle in the video appeared to be Defendant's vehicle, which was subsequently seized and searched pursuant to a warrant, it was impossible to definitively say that it was the same, as the videos did not capture the license plate she could not see who was in the vehicle.

Dr. Terry Welke ("Dr. Welke") was accepted by stipulation as an expert in the fields of medicine and forensic pathology. Dr. Welke testified that Mr. Reynaud was shot in the lower back from within two feet. He also testified that Mr. Reynaud was shot in the back of the head, though he could not definitely say whether that gunshot was within two feet, or if it was farther. Dr. Welke felt that Mr. Reynaud was likely shot in the back first then shot again with the "execution style" shot to the head. He stated that Mr. Reynaud's death was a homicide caused by a "gunshot wound to the head." He also stated that the bullets recovered from Mr. Reynaud's body were large caliber, but he could not give a specific caliber size.

Ms. LeAnne Suchanek ("Ms. Suchanek"), a former DNA Technical Manager for the Southwest Louisiana Crime Lab, was accepted by stipulation as an expert in the field of DNA testing. Ms. Suchanek testified that she was the DNA analyst of record for the evidence recovered in this case. She tested a black mask, two black socks, and a black head wrap. She noted there was more than one contributor of DNA on the mask, a major contributor on the head wrap, and a multiple contributor mixture on the bloodstains on the socks. Ms. Suchanek testified that she ran the major contributor for the mask and the head wrap through the Combined DNA Index System (CODIS) and received a notification that the

3

major contributor for the mask could be Defendant, whose DNA was in the system due to a prior armed robbery conviction. She further testified that she compared the major contributor from the ski mask with a blood sample taken from Defendant, and it was a match with "the probability of randomly selecting an individual from the general population with that same DNA profile [was] approximately one in 881 quadrillion." She also noted the major contributor for the head wrap was Mr. Willis.

Sergeant Keith Lacosio, with the Jefferson Parish Sheriff's Department, identified Defendant as the individual he arrested in 2002, for the armed robbery of a cab driver. Defendant pled guilty to armed robbery on May 21, 2002 and received a ten-year sentence.

Detective Colby Thompson ("Detective Thompson") of the Lake Charles Police Department testified that he headed the investigation into Mr. Reynaud's murder. Detective Thompson testified that after he received the CODIS hit on Defendant's DNA being the major contributor on the ski mask, another detective drove by Defendant's home and noticed that the vehicle parked there appeared to match the vehicle in the video footage obtained from businesses near the shooting. The vehicle's license plate was run through the Department of Motor Vehicles database and found to be registered to Defendant and his wife, Mrs. Arrington. Detective Thompson noted that when the search warrants for Defendant's home and vehicle were executed, Mr. Barber and Mr. Carter, who admitted that they were the two other intruders in Mr. Olivier's home, were also at the home. Detective Thompson testified that while searching Defendant's vehicle, he found a small sawed-off shotgun behind the driver's seat. He stated that one of the individuals pointed him in the direction of Mr. Payne as also being involved. Detective Thompson and his team obtained a search warrant for Mr. Payne's home

4

and recovered three loaded weapons, none of which were involved in the murder of Mr. Reynaud.

Brandy Love-Bodin, an evidence officer with the Lake Charles Police Department, testified that she recovered six cell phones from Mr. Payne's home, including a black cell phone which was entered into evidence as State's Exhibit 56. Lieutenant Tim Richards of the Lake Charles Police Department testified that he did a data extraction on State's Exhibit 56. He testified that the phone belonged to Mr. Payne.

Mr. Payne stated that he was testifying as part of a plea deal whereby the State would allow him to plead guilty to two counts of illegal possession of firearms in exchange for "[his] honest testimony." Mr. Payne testified that he had known Defendant since they were teenagers and that they reconnected around 2012. He testified that despite being a convicted felon, he frequently purchased and sold stolen weapons. He stated Defendant and his wife asked him for a gun while they were working in his recording studio because they had someone they wanted to rob and that he refused to sell them one. He further testified that about a week later, Defendant called him claiming someone tried to break into Defendant's studio and again asked for a weapon, this time for protection. At that time, he gave Defendant a .45 caliber Ruger revolver, although all he knew about the model was that it started with a "V."

Mr. Payne testified that he later asked Defendant via Facebook and text messaging about the gun, but Defendant would not give him the gun back. Mr. Payne testified that about a week after Mr. Reynaud's murder, Defendant told him "that was his work, and he started laughing." Mr. Payne stated he did not call the police because he did not take Defendant seriously. He also acknowledged that he did not tell the police everything he knew when he was initially arrested.

Mr. Charles Watson ("Mr. Watson"), a Forensic Scientist with the Louisiana State Police Crime Lab, was accepted by stipulation as an expert in the fields of ballistics and firearm examination. He testified that the bullets recovered from the victim were fired from a .45 caliber revolver, and he noted that Ruger made a .45 caliber gun called a "Viquero." Mr. Watson finally testified that none of the weapons which were submitted to him for testing could have fired the bullet fragments recovered from Mr. Reynaud.

Mr. Carter, Defendant's nephew and codefendant, testified that after they had spent the day drinking, Mr. Barber decided that he, Mr. Carter, and Defendant should commit the robbery that led to Mr. Reynaud's death. He stated that Mr. Barber distributed the weapons, keeping the sawed-off shotgun for himself, and giving him a long shogun, and Defendant a revolver. Mr. Carter claimed that he was unfamiliar with the area, but that they took Defendant's Trailblazer and headed to the house they had previously passed on the way back from drinking. Mr. Carter testified that Mr. Barber kicked down Mr. Olivier's door and entered first, with Defendant second and him bringing up the rear. Mr. Carter testified that, as far as he was aware, Defendant was the only person whose gun was loaded.

Mr. Carter further testified that when he entered the trailer, he did not see Mr. Barber, but Defendant had Mr. Reynaud at gunpoint in the living room. He claims that he told Defendant to follow Mr. Barber, as he was "going to hold it down right cher[sic]." According to Mr. Carter, he turned when Mrs. Pappion ran past him out the door, and at that point, Mr. Reynaud jumped up and attacked him. He claimed he was struggling with Mr. Reynaud for control of the gun when Defendant came back into the room and shot Mr. Reynaud in the back. Mr. Carter testified that after he and Defendant realized that he had not been shot by the bullet, Mr. Reynaud fell to the ground, and when moved after he had fallen,

Defendant panicked and shot him in the head. He testified that Defendant put the gun to the victim's head, with the barrel touching skin, and pulled the trigger. At that point, he and Defendant fled the trailer and waited for Mr. Barber to rejoin them outside before driving off in the Trailblazer, which he and Mr. Barber subsequently ditched in Iowa, Louisiana. Mr. Carter stated that he struck a plea deal to provide "truthful testimony" against Defendant, his uncle, in exchange for pleading guilty to armed robbery. He also acknowledged that he pled guilty in September of 2016 to aggravated battery, a reduced charge that was originally attempted murder. Mr. Carter noted that Defendant used a black mask to keep the wind off his face when he was working offshore. He disagreed with the coroner's statement that the barrel of the gun was not touching the victim on either shot, insisting the gun was touching skin.

## PATENT ERROR REVIEW:

In reviewing the record for errors patent, this court finds that the trial court gave the Defendant erroneous advice as to the time period for filing post-conviction relief. The Defendant was advised at sentencing that he has two years "from today's date and the sentence becoming final to file for post-conviction relief." According to La.Code Crim.P. art. 930.8, the prescriptive period for filing post-conviction relief is two years, and it begins to run when a defendant's conviction and sentence become final under the provisions of La.Code Crim.P. arts. 914 or 922. Although part of the trial court's advisement was correct, we find that the trial court's statement that Defendant has two years from "today's date" was incorrect. Therefore, out of an abundance of caution, we direct the trial court to inform Defendant of the correct provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record of the proceedings that

7

Defendant received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

**ASSIGNMENT OF ERROR NO. 1:**

In his first assignment of error, Defendant argues the evidence presented by the State was insufficient under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), to identify Defendant as the perpetrator of the crime beyond a reasonable doubt. The analysis for a sufficiency claim is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Although Defendant has alleged that the evidence was insufficient to support his conviction, his argument is based solely on issues of identification. Because Defendant has failed to allege insufficiency with regard to any of the elements of second degree murder, we will address only the issue of identification. As this court has previously noted, "[w]hen identity is at issue, the State must negate any reasonable probability of misidentification." *State v. Clark*, 10-559, p. 4 (La.App. 3 Cir. 12/8/10), 52 So.3d 304, 307.

Defendant's argument is that the State failed to prove that he was one of the people who took part in the murder of Mr. Reynaud. This argument lacks merit.

The State's DNA expert, Ms. Suchanek, testified that Defendant was the major contributor of DNA found on the black ski mask recovered from the crime scene. Both Mr. Willis, and his wife Mrs. Pappion, testified that the intruders had their faces covered, with Mr. Willis stating two were wearing ski masks. Additionally, Defendant's nephew and codefendant, Mr. Carter, testified that not only was Defendant one of the intruders, but that Defendant was in fact the individual armed with a revolver who shot Mr. Reynaud.

Defendant argues his DNA inside the mask does not prove he was present at the crime scene, as there was testimony that he used the same type of mask at work. Additionally, he argues that Mr. Carter was an unreliable witness whose testimony on multiple details of the night's events was contradicted by other witnesses. Ironically, the only witness to provide testimony that Defendant used a similar ski mask at work was Mr. Carter.

Defendant's argument, with regard to Mr. Carter's testimony, is unpersuasive. While Defendant correctly points out that Mr. Carter's testimony regarding the proximity of the gun to the victim's skin was contradicted by the coroner, and Mr. Carter's claim that only Defendant's weapon was loaded, was likewise contradicted by Mr. Olivier's testimony that he was shot with the sawed-off shotgun, the jury clearly believed Mr. Carter's testimony vis-à-vis Defendant's involvement. As this court has previously stated:

> In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. The question of the credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. The credibility of the witnesses will not be re-weighed on appeal.

*State v. Westmoreland*, 10-1408, p. 6 (La.App. 3 Cir. 5/4/11), 63 So.3d 373, 379, *writ denied*, 11-1660 (La. 1/20/12), 78 So.3d 140 (quoting *State v. Perry*, 08-1304 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, *writ denied*, 09-1955 (La. 6/25/10), 38 So.3d 352).

Mr. Carter's testimony that Defendant was one of the individuals who entered Mr. Olivier's home, and was the individual who shot and killed Mr. Reynaud, is not contradicted by any of Mr. Carter's other testimony, despite discrepancies between his recollection of other details and the testimony of other witnesses. Additionally, the presence of Defendant's DNA inside a ski mask recovered from the scene of the murder supports, rather than conflicts with, Mr. Carter's claim that Defendant was present in the house. Mr. Carter's testimony alone is sufficient to support Defendant's conviction. This court will not re-weigh the credibility of the witnesses in this case. *Westmoreland*, 63 So.3d 373. Moreover, Defendant's contention that Mr. Carter is an unreliable witness lacks merit, as it does nothing more than ask this court to re-assess witness credibility on appeal. Accordingly, Defendant's assignment of error number one lacks merit.

**ASSIGNMENT OF ERROR NO. 2:**

In Defendant's second assignment of error, he argues that the trial court erred in denying his numerous objections to Louisiana's non-unanimous jury verdict rule enunciated in La.Code Crim.P. art. 782 which states "[c]ases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict." As noted by Defendant, the supreme court has recently upheld La.Code Crim.P. art. 782 as constitutional in *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738. Additionally, Defendant acknowledges the Supreme Court's 1972 holding that a state court conviction obtained by a less than unanimous jury was

constitutional is still good law. *See Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628 (1972). Defendant argues that recent supreme court rulings have called into question the reasoning of the *Apodaca* opinion. However, Defendant can provide no other support for his assertion that La.Code Crim.P. art. 782 is unconstitutional. We find no merit to this contention.

> Due to this Court's prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court's still valid determination that non-unanimous 12-person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.

*Bertrand*, 6 So.3d at 743.

Defendant is asking this court to do exactly what the supreme court refused to do in *Bertrand* – presume, based solely upon speculation, that the United States Supreme Court will one day overturn *Apodaca*. Accordingly, we find that Defendant's assignment of error number two lacks merit.

## CONCLUSION:

For the foregoing reasons, we affirm the trial court's April 10, 2017, conviction of Defendant for the charge of second degree murder. We further direct the trial court to inform Defendant of the correct provisions of La.Code Crim.P. art. 930.8, by sending appropriate written notice to Defendant within ten days of the rendition of this opinion, and to file written proof in the record of the proceedings that Defendant received the notice.

**CONVICTION AFFIRMED; REMANDED WITH INSTRUCTIONS**